No. 14-1250

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

MEW SPORTING GOODS, LLC,

*Petitioner-Appellant*

v.

DAVID D. JOHANSEN,

*Respondent-Appellee.*

_____

**Appeal from the U.S. District Court
for the Northern District of West Virginia
(Irene M. Keeley, District Judge)**
_____

**BRIEF OF APPELLANT
MEW SPORTING GOODS, LLC**
_____

Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

September 15, 2014                    *Counsel for Appellant*

---

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1250__        Caption: __MEW Sporting Goods, LLC v. David Johansen__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__MEW Sporting Goods, LLC__
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Dan M. Peterson                        Date:   September 15, 2014

Counsel for: MEW Sporting Goods, LLC

## CERTIFICATE OF SERVICE
**************************

I certify that on  September 15, 2014   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Dan M. Peterson                        September 15, 2014
        (signature)                                (date)

- 2 -

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ....................................................................iv

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES ......................................................................2

STATEMENT OF THE CASE ................................................................3

SUMMARY OF ARGUMENT ..............................................................15

ARGUMENT ..........................................................................................18

Standard of Review ..............................................................................18

I. 18 U.S.C. § 923(d)(1) DOES NOT REQUIRE DISCLOSURE
ON AN FFL APPLICATION OF INDIVIDUALS WHO ARE NOT
PROHIBITED PERSONS AND ARE NOT APPLICANTS ..................................19

    A. The relevant statutes do not permit ATF to deny
    or revoke an application because a responsible person
    has previously been associated with a revoked FFL. ....................................21

    B. The district court erred in adding language to
    the statute regarding applicants and responsible persons ............................23

II. THE EVIDENCE OF RECORD DID
NOT ESTABLISH THAT TERESA WALSH
WAS AN OWNER OR RESPONSIBLE PERSON ................................................34

    A. Teresa Walsh was indisputably not an owner
    of Mountaineer..................................................................................................34

    B. The district court improperly determined that
    Teresa Walsh was a responsible person for Mountaineer ............................36

1 .Teresa Walsh had no legal power to direct, or cause the direction of, the management and policies of Mountaineer.. .................36

2. The evidence relied on by ATF and the district court does not establish that Teresa Walsh had the power to direct or cause the direction of the management and policies of Mountaineer ...............................................................37

III. EVEN IF TERESA WALSH WAS A RESPONSIBLE PERSON AT MOUNTAINEER, ANY OMISSION TO DISCLOSE HER ON THE MOUNTAINEER APPLICATION WAS NOT A WILLFUL VIOLATION.......................................49

IV. THE *CASANOVA GUNS* "SUCCESSOR IN INTEREST" TEST DOES NOT APPLY ........................................................53

A. To the extent that *Casanova Guns* applies the terms of the federal licensing statute to the facts in that case, it is not relevant to the case at bar. ...............................54

B. To the extent that *Casanova Guns* disregards corporate entities, the facts differ from those in the case at bar and the reasoning would be surplusage ...................................56

CONCLUSION ..........................................................59

REQUEST FOR ORAL ARGUMENT ...............................59

CERTIFICATE OF COMPLIANCE...............................61

ADDENDUM

CERTIFICATE OF SERVICE

iii

# TABLE OF AUTHORITIES

**Page**

## CASES

*American Arms International v. Herbert*,
563 F.3d 79 (4th Cir. 2009)....................................................................18, 49, 50, 51

*Armalite, Inc. v. Lambert,* 544 F.3d 644 (6th Cir. 2008)....................................18, 49

*Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281 (4th Cir. 2004)...........................18

*Bryan v. United States*, 524 U.S. 184 (1998)..........................................................50

*Casanova Guns, Inc. v. Connally,* 454 F.2d 1320 (7th Cir. 1972) .............. 53, 56-59

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................19

*Mershimer v. Bowers*, 395 Fed.Appx. 993 (4th Cir. 2010) .....................................51

*National Rifle Ass'n v. Brady*, 914 F.2d 475 (4th Cir. 1990)..................................27

*Perpetual Real Estate Services, Inc. v. Michaelson
Properties, Inc.*, 974 F.2d 545 (4th Cir. 1992) .......................................................56

*Prino v. Simon*, 606 F.2d 449 (4th Cir. 1979)................................................49, 50, 51

*RSM, Inc. v. Herbert*, 466 F.3d 316 (4th Cir.2006) ...............................................50

*XVP Sports, LLC v. Bangs*, No. 2:11CV379, 2012
WL 4329263 (E.D.Va., Mar. 21, 2012) ..................................................................25

iv

## CONSTITUTIONS, STATUTES, AND ORDINANCES

18 U.S.C. § 921 ................................................................................30

18 U.S.C. § 922(a) ...........................................................................23

18 U.S.C. § 922(g) ......................................................................*passim*

18 U.S.C. § 922(n) ......................................................................*passim*

18 U.S.C. § 923 ......................................................................3, 16, 28

18 U.S.C. § 923(a) ...........................................................................16

18 U.S.C. § 923(c) ...........................................................................28

18 U.S.C. § 923(d)(1) .................................................................*passim*

18 U.S.C. § 923(d)(1)(B) ...........................................................*passim*

18 U.S.C. § 923(d)(1)(C) ...........................................................*passim*

18 U.S.C. § 923(d)(1)(D) ...........................................................*passim*

18 U.S.C. § 923(f)(3) ..........................................................................1

18 U.S.C. § 926 ................................................................................30

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

27 C.F.R. § 478.47(b)(2) .................................................................30

W. Va. Code § 31B-2-201 ..........................................................35, 56

W. Va. Code § 31B-2-202(a) ...............................................................35

W. Va. Code § 31B-4-404 ...............................................................4, 36

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a).....................................................................18

A. Scalia & B. Garner, *Reading Law: The Interpretation
of Legal Texts*, 69 (2012) ...........................................................30

Webster's New World College Dictionary (4th Ed. 2006)......................................30

## JURISDICTIONAL STATEMENT

The action below was brought by MEW Sporting Goods, LLC ("MEW") pursuant to 18 U.S.C. § 923(f)(3) to review a denial of MEW's application for a federal firearms license.  JA 6.   The denial was issued by David D. Johansen, Director of Industry Operations, Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") Louisville, KY Field Division.   Jurisdiction in the District Court was founded on 28 U.S.C. § 1331 as this case arises under the laws of the United States.  JA 6.  Jurisdiction exists for this appeal pursuant to 28 U.S.C. § 1291 because it is an appeal from a final decision of a United States District Court. The appeal is from a final order and judgment of the District Court for the Northern District of West Virginia dated January 21, 2014, granting summary judgment to respondent Johansen and denying summary judgment to petitioner MEW, thereby disposing of all of the parties' claims.  JA 394.  The notice of appeal was timely filed on March 20, 2014.  JA 419.

1

## STATEMENT OF ISSUES

1.      Whether 18 U.S.C. § 923(d)(1) requires disclosure on an FFL application of individuals who are not prohibited persons and are not applicants.

2.      Whether the evidence of record established that Teresa Walsh was an owner or responsible person for Mountaineer.

3.      Whether any omission to disclose Teresa Walsh on the Mountaineer application was shown to be a "willful" violation.

4.      Whether the district court erred in applying the *Casanova Guns* "successor in interest" test.

## STATEMENT OF THE CASE

This case challenges the denial by the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") of an application by MEW Sporting Goods, LLC ("MEW"), for a federal firearms license ("FFL"). JA 27. An FFL is necessary to be a retail dealer in firearms. 18 U.S.C. § 923. Mark Walsh is the sole member of MEW, a limited liability company formed under West Virginia statutes on January 31, 2012. JA 6, 15. Respondent David D. Johansen is the Director of Industry Operations for ATF's Louisville, Kentucky Field Division. JA 7, 15.

The facts and proceedings in this case are intertwined with a prior proceeding involving another company, Mountaineer Gun Sales LLC ("Mountaineer"), located in Morgantown, West Virginia. In 2011, Mountaineer's FFL was revoked by ATF in truncated proceedings. JA 193. The denial of MEW's FFL application was predicated on events that occurred in the Mountaineer case. JA 27. In denying MEW's application, ATF claimed that with respect to Mountaineer, Mark Walsh committed a "willful violation" of the Gun Control Act, 18 U.S.C. Ch. 44. JA 28. According to the Final Notice of Denial of Application for MEW, Mark Walsh allegedly "willfully failed to disclose … material information" on the Mountaineer application for an FFL, in violation of 18 U.S.C. § 923(d)(1)(D). The alleged material information that was not disclosed was that his wife Teresa Walsh was a

3

"responsible person" for Mountaineer.  JA 28.  Because of that asserted willful

failure by Mountaineer to disclose material information under § 923(d)(1)(D), ATF

contends that Mr. Walsh is individually a "willful violator" and denied the

application by MEW for an FFL under § 923(d)(1)(C).  JA 32.  MEW denies that

Teresa Walsh was a responsible person for Mountaineer, that the information was

material and needed to be disclosed, that Mark Walsh was found to have committed

a violation of the GCA in the Mountaineer revocation, and that there was any

violation of law at all, much less a willful violation, in connection with

Mountaineer.  The detailed facts are as follows:

Prior to Mark and Teresa Walsh's marriage, Mrs. Walsh (then known as

Teresa Snyder) had a firearms dealership in Kingwood, West Virginia, incorporated

as TGS Sporting Goods, Inc. and trading as "Flintlock's."  JA 284.  In early 2006,

the FFL for TGS Sporting Goods, Inc. was revoked due to a number of

recordkeeping violations.  JA 259.

In 2008, Mr. Walsh formed Mountaineer Gun Sales.  JA 217.  He was the

sole member of the LLC, JA 218, and it is undisputed that under West Virginia law

he therefore had sole legal power and control over the management, policies, and

affairs of the Mountaineer.  W. Va. Code § 31B-4-404.  Teresa Walsh was not a

member, owner, officer, or director of Mountaineer.  JA 20-21, 218. Two other

4

LLCs were also formed at the same time, Mountaineer Country Ice Cream, LLC and Mountaineer Country Rentals, LLC.  JA 222-231    Mark and Teresa Walsh were both members of Mountaineer Country Ice Cream, LLC and Mountaineer Country Rentals, LLC.  JA 223, 228.  Mountaineer Country Rentals, LLC was the landlord for Mountaineer Country Ice Cream, LLC and Mountaineer Gun Sales, LLC. JA  154.  There was no evidence of any ownership or control relationship by either of these entities over Mountaineer Gun Sales, LLC, and Mr. Walsh testified that Mountaineer Country Rentals did not have any control, directly or indirectly, over Mountaineer Gun Sales, LLC.  JA 115, 154.

By application dated March 30, 2008, Mountaineer Gun Sales, LLC applied for a federal firearms license.  JA 253-58.  The application was in the name of Mountaineer Gun Sales, LLC (JA 253).  The application form (Form 7) has a place, Item 22, in which to list any individual who is a "responsible person" for the FFL. JA 254-55.    Items 24, 25, and 26 ask a series of questions about applicants and responsible persons, and distinguish between the two, inquiring "Has Applicant *or* any Person Referred to in Item 22 Above" met certain criteria.   JA 255-56 (emphasis added).   The form states that a "responsible person" is, in addition to a sole proprietor, "In the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the

5

direction of the management, policies, and practices of the corporation, partnership, or association, insofar as they pertain to firearms."[1]  JA 257, line 10.  Mark Walsh listed himself as a "responsible person," and signed the application as "owner."  JA 254-56.  On May 30, 2008, Mark Walsh paid $15,000 to Flintlock's as a down payment for firearms that had been in the inventory of Teresa Walsh's former firearms business. JA 127-28; 288.  Firearms transferred from the former business were sold by Mountaineer pursuant to a written consignment agreement.  JA 21.  ATF Investigator Malaskovitz testified at the informal administrative hearing that he was not aware of what the financial arrangements were for these firearms.  JA 98-99.

Investigator Malaskovitz conducted an initial inspection in 2008, and the application by Mountaineer for an FFL was approved.  At the time of the initial inspection, the building that ultimately housed Mountaineer Gun Sales was not yet

---

[1] This is a variation from the statutory definition, which states that an application for an FFL shall be granted if certain criteria in 18 U.S.C. § 923(d)(1) are met by the applicant.  One of these, subparagraph (d)(1)(B) is that "the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) *is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n) of this chapter*."(emphasis added).  Neither Mark Walsh nor Teresa Walsh is or was prohibited from transporting, shipping, or receiving firearms or ammunition under §§ 922(g) and (n).

constructed.  JA 129.

Beginning on March 22, 2011, Investigator Malaskovitz conducted a "compliance inspection" of Mountaineer.  JA 58, JA 194.  This was ostensibly in response to a telephone conversation between an ATF employee in the Charleston office, who did not testify at the hearing, and an alcoholic ex-employee of Mountaineer named Sherri Flint, who had been terminated and re-hired several times.  JA 67, 72, 141.  As recounted by Investigator Malaskovitz, who did not hear the conversation or see any notes of it, Sherri Flint stated that she had been asked by Teresa Walsh to sign a gun sale form (Form 4473) when she was not the individual who actually made the sale.  JA 57-58, 67.  This allegation was not confirmed. JA 71-72, 101-03.  According to Investigator Malaskovitz, Ms. Flint later denied making the call or that statement.  JA 62.  Mr. Walsh specifically denied that Sherri Flint was ever told to do that.  JA 137.

After the inspection, ATF issued a Notice of Revocation of Mountaineer's FFL.  JA 396.  Mountaineer timely requested a hearing regarding that revocation, JA 186, but later withdrew the hearing request. JA 396.

On November 3, 2011, ATF issued a Final Notice of Revocation of Mountaineer's FFL, on the ostensible grounds that "Mountaineer Gun willfully failed to disclose material information on its application for a Federal firearms

7

license when it applied on ATF Form 7….." JA 194.  The alleged material omission was that Teresa Walsh was "an owner and responsible person of Mountaineer Gun…."    JA 195.  There was no finding in the Final Notice that Mark Walsh committed any willful violation of the Gun Control Act.  JA 193-97.

Shortly thereafter, Mountaineer obtained new counsel who filed a complaint in the Northern District of West Virginia seeking judicial review, a stay of the effective date of the Final Notice, and a preliminary injunction against enforcement of the Final Notice.  JA 198.  The district court, Keeley, J., found that the court had no subject matter jurisdiction due to failure to exhaust administrative remedies,  JA 205-06, and thus did not rule on the merits of the revocation.  The court did discuss "alternative" grounds relating to "likely" denial of the preliminary injunction if the court had power to reach that issue, but the holding of the court was clearly founded on lack of jurisdiction.  *Id.*; JA 206, 214.

Shortly thereafter, MEW was formed and applied for an FFL on February 13, 2012.  JA 190.    The application listed Mark E. Walsh and his son Mark A. Walsh as responsible persons.  JA 188.  The application was denied by ATF, and an informal administrative hearing was held before an ATF employee on October 18, 2012.  JA 33, 42-44.  ATF submitted twelve exhibits into the record, and MEW submitted six additional exhibits. JA 39-40; *see* JA181-314.  Two witnesses, ATF

8

Investigator Malaskovitz  and Mark Walsh, testified at the hearing and were cross-examined by counsel.  JA 56-166.  The informal hearing focused on the events that had occurred with respect to Mountaineer, including whether Teresa Walsh was an owner or responsible person.

In addition to the facts set forth above, evidence at the hearing and in sworn declarations established that:

Mountaineer has a store located at 659 Point Marion Road, Morgantown, WV 26505, which opened in November 2008.  JA 20. The business has a large fishing department, an archery department, a gift department, and sells sporting goods generally.  *Id.*; JA 74.  It also has a firearms department, in which antique firearms[2] are sold and modern firearms used to be sold.  JA 20. The firearms department was a relatively small part of the Mountaineer store, taking up perhaps one-sixth of the store.  JA 90. Mountaineer Country Ice Cream and a greenhouse are also operated in the same location.  JA 21.  Photographs of the store and a diagram of the store's layout are included at JA 289.

Teresa Walsh is not and was not an owner or member of Mountaineer.  JA 20, 218.  The sole member (owner) of Mountaineer is and was Mark Walsh. JA 20, 218. The only evidence in the record that Teresa Walsh was purportedly an owner

---

[2] No FFL is required to sell antique or muzzleloader firearms.

9

of Mountaineer came from   Investigator Malaskovitz, who testified that an employee of Mountaineer, Peggy White, was under the "impression" that Teresa was an owner.  JA 113.  But Mark Walsh never discussed with employees who owned the business. JA 155.  Investigator Malaskovitz conceded that he did not know why Peggy White was under impression that Teresa Walsh was an owner of Mountaineer—he never asked her why. JA 115-16.  He didn't know if Peggy White had reviewed any financial records in that regard.  JA 116.  He himself did no review of Mountaineer's finances to determine if Teresa Walsh had any ownership interest.  JA 110.  Ultimately, Malaskovitz testified at the hearing that he did not know whether Teresa Walsh had any ownership interest in Mountaineer. JA 110.

Mark Walsh was employed by Mylan Pharmaceuticals Inc., where he worked until about 3:15 p.m. Monday through Friday.  Mark Walsh was involved in firearms sales when he came to the store after work.   JA 136-37.  From about 4 p.m. Monday through Friday until the store closes at 7 p.m. (winter hours) or 9 p.m. (summer hours), and all day Saturday and Sunday, and most vacation days, and on federal holidays, he worked at the Mountaineer store where he sold firearms, fishing equipment, and archery equipment.  JA 20, 124, 130.  He is present about 30-40 hours a week. JA 156.

Teresa Walsh held the position of clerk, and had signed the majority of the

10

Form 4473s as clerk.   JA 63.  Mark Walsh did not complete Forms 4473 because he had trouble hearing people on the phone, so Teresa Walsh would call in transfers to the FBI and complete the Forms 4473 for sales by him. JA 136-37.  Mark Walsh testified that Teresa Walsh could complete Forms 4473, and could help Mark Walsh in completing the Acquisition and Disposition Record Book.  JA 126-27.  Investigator Malaskovitz agreed that there was no problem with Mrs. Walsh as clerk making actual sales of firearms and completing the transfer forms.   Mr. Malaskovitz testified during the hearing that "as a store clerk, she could certainly handle the – the transfers of the -- of the forms, the transfers of the firearms . . . ." JA 105; *see also* JA 77, 104.

Sherry Flint told ATF Investigator Malaskovitz that she was, and had been, the gun manager. JA 62.  At the time of the compliance inspection, employee Peggy White was not yet the gun manager, but was going to become the gun manager because Mountaineer had prepared the "responsible person" form and fingerprint cards (which had been completed on March 14, 2011, prior to the inspection by Investigator Malaskovitz).  These had been prepared for submission to ATF, but not yet submitted, to designate her as a responsible person for Mountaineer. JA 59-60, 77-78, 146, 314.   During the 2011 inspection, Teresa Walsh showed ATF Investigator Malaskovitz those fingerprint cards for Peggy White which had been

11

completed in order to designate Peggy White as a responsible person for Mountaineer. *Id.*

Most firearms were sold on weekends and evenings, when Mark Walsh was present, so there were not many sales by Sherry Flint and Peggy White. JA 159.

Teresa Walsh did not have the authority to hire employees. JA 21. She could suggest someone as an employee and, if Mr. Walsh agreed, he would give her permission to hire the person. JA 21. Mark Walsh testified that he selected employees himself and instructed Teresa Walsh "to hire them"; Teresa Walsh could take employment applications, but not hire employees without his permission. JA 133-34. Mark Walsh testified that only he fired employees from the firearms business; her only role in firing employees may be to "relay it to them." JA 134.

Mark Walsh testified that he selected which firearms he wanted to sell. JA 135. Based on his decisions, Teresa Walsh placed orders "during the daytime because she's -- I'm not there during the day . . . to deal with the wholesalers." JA 135; *see also* JA 21. Most of the time, Mark Walsh would log in new firearms. JA 135. Inspector Malaskovitz testified that Mark Walsh told him that both he and Teresa Walsh had signing authority for employee paychecks on the business checking account, though Inspector Malaskovitz did not determine to which of the three businesses that statement related. JA 117.

12

Mark Walsh informed the ATF investigator that Teresa Walsh ran Mountaineer's business when he was not present as she ran the fishing department, the archery department, the muzzleloading firearms department, and the gift department. JA 21, 139. Teresa Walsh manages Mountaineer Country Ice Cream and operates the greenhouse. JA 21. Mark Walsh did not inform the ATF investigator that Teresa Walsh ran Mountaineer's firearms business. *Id.*

Teresa Walsh will not be involved in firearms sales for MEW Sporting Goods, LLC JA 160. Mark Walsh already has a gentleman working for him who can handle firearms sales when he is not there, and will probably hire another one. JA 160. MEW Sporting Goods, LLC will only sell firearms, and all other business at the location will continue to be conducted by Mountaineer. JA 161.

On December 5, 2012, ATF issued a Final Notice of Denial of MEW's application. JA 27. Among other things, this Final Notice noted that the application was submitted by "MEW Sporting Goods, LLC," and found that "MEW Sporting Goods owner and responsible person Mark Walsh previously committed a willful violation of the Gun Control Act of 1968…while he owned …Mountaineer Gun Sales…." JA 28. The Final Notice of Revocation of Mountaineer Gun Sales contained no finding that Mark Walsh committed a willful violation. The MEW Final Notice of Denial described "Mark Walsh" as having "applied for a Federal

13

firearms license doing business as Mountaineer." JA 28. However, the "corporation" that submitted that application was Mountaineer Gun Sales, LLC, with no "trade or business name" listed. The application was not submitted by Mark Walsh personally using a "d/b/a." JA 253. The Final Notice of Denial for MEW stated that Mark Walsh "intentionally omitted the name of Teresa Walsh as an owner and responsible person for Mountaineer" on the application form. JA 28. Therefore, according to ATF, Mr. Walsh and Mountaineer "willfully failed to disclose material information on the application," citing 18 U.S.C. § 923(d)(1)(D). JA 28. MEW filed its petition for review of this Final Notice in the district court on January 23, 2013. JA 6.

The parties filed cross-motions for summary judgment in the summer of 2013. JA 2-3 (Dkt. Nos. 11, 16, 17, 23-26). In addition to the evidence in the administrative record, MEW also filed a sworn declaration by Mark Walsh. JA 20-22. A telephonic hearing regarding how to address the summary judgment filings, and whether an evidentiary hearing was necessary, was held by Judge Keeley with the parties on November 21, 2013. JA 317. Supplemental briefs were submitted shortly thereafter. JA 4 (Dkt. Nos. 35, 36). On January 21, 2014, the district court issued its Memorandum Opinion and Order Granting Respondent's Motion for Summary Judgment and Denying Petitioner's Motion for Summary Judgment. JA

14

394.  A Notice of Appeal was timely filed by MEW on March 20, 2014.  JA 419.

## SUMMARY OF ARGUMENT

ATF is required to grant an application for an FFL if the seven listed criteria in 18 U.S.C. § 923(d)(1), subparagraphs (A) through (G), are met.  The only subparagraph that considers the qualifications of "responsible persons" in addition to "applicants" is subparagraph (B).  That subparagraph provides that, in the case of corporations or similar entities, the application will not be approved if the applicant or any individual possessing the power to direct or cause the direction of the management and policies of the corporation or entity  (a "responsible person") is prohibited from transporting, shipping, or receiving firearms in commerce under 18 U.S.C. §§ 922(g) or (n).  These include felons, the mentally ill, drug addicts, and other prohibited persons.  Individuals who may have been associated with an FFL which has had its licensed revoked are not prohibited persons under §§ 922(g) or (n).   Subparagraph (C) provides that an application will be denied if the applicant has willfully violated the Gun Control Act.  Subparagraph (D) provides that an application will be denied if an applicant has willfully failed to disclose any material information on the application.  Both Subparagraphs (C) and (D) do not apply to violations or failures to disclose by "responsible persons" and that concept is not applicable to those subparagraphs.

15

Accordingly, ATF may not deny an application or revoke an FFL because an individual who has previously been associated with a revoked FFL is a "responsible person" in relation to the applicant. Omission of Teresa Walsh, who had formerly been associated with a revoked FFL, on the Mountaineer application is consequently not a failure to disclose "material" information under subparagraph (D), and does not result in a "willful violation" under subparagraph (C). In addition, ATF does not have the authority to require disclosure of individuals, such as Teresa Walsh, who are not prohibited persons under §§ 922(g) and (n), because only information "necessary to determine eligibility for licensing" may be required on the application pursuant to 18 U.S.C. § 923(a).

The district court erred in adding language to 18 U.S.C. § 923 by defining "applicant" to include the applicant and any responsible persons wherever the term "applicant" appears. There is no warrant for doing so, § 923(d)(1) and its subparagraphs are perfectly clear and logical as written by Congress, and any policy arguments should be directed to Congress, not the courts. There are good reasons why Congress wrote the statute the way it did, and § 923(d)(1)(B) is a provision of substantive law, not a "definitions" subparagraph. The district court also erred in later defining "applicant" to mean only the person who signs the application, not the entity actually applying for a license. This definition of "applicant" directly

16

contradicts the previous definition of "applicant" expounded by the district court.

The evidence was conclusive that Teresa Walsh was not an "owner" of Mountaineer.  She also was not, in fact, a "responsible person" of Mountaineer. The types of activities she performed were ministerial and clerical, and can be performed by a clerk in a firearms dealership.  Those activities did not give her the power to direct the management and policies of Mountaineer.  The only member of Mountaineer was Mark Walsh, and he possessed exclusive legal power to direct the management and policies of Mountaineer.  The evidence also showed that he retained that right with respect to all important management decisions, and that Teresa Walsh sometimes carried out those decisions at his direction. Even if Mountaineer was required to disclose "responsible persons" on its FFL application, Teresa Walsh did not meet the definition of responsible person and there was no violation of law in omitting her name on the application.

In addition, there was no evidence whatsoever that any asserted violation by Mountaineer or Mark Walsh was a "willful" violation.  The district court did not consider or discuss evidence of willfulness, and the facts do not show a willful violation under the definitions employed by this Court.

The *Casanova Guns* "successor in interest" test applied by the district court adds nothing to this case.  If the government meets its burden of showing all of the

17

elements of a willful violation, *Casanova Guns* is superfluous. If it does not, and MEW's application was proper, there is no "circumvention" of a statute and *Casanova Guns* does not apply.

## ARGUMENT

### Standard of Review

Review by this Court of the district court's grant and denial of summary judgment is *de novo*. *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 286 (4th Cir. 2004).

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the court "must view the evidence in the light most favorable to the nonmoving party." *Blaustein & Reich,* 365 F.3d at 286.

In an ATF license proceeding, "A federal court reviewing such a revocation may grant summary judgment 'if no genuine issue of material fact exists about whether [the licensee] willfully violated an applicable statutory or regulatory provision.'" *American Arms International v. Herbert*, 563 F.3d 79, 83 (4th Cir. 2009) (quoting *Armalite, Inc. v. Lambert,* 544 F.3d 644, 647 (6th Cir. 2008)). Summary judgment is appropriate "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## I.  18 U.S.C. § 923(d)(1) DOES NOT REQUIRE DISCLOSURE ON AN FFL APPLICATION OF INDIVIDUALS WHO ARE NOT PROHIBITED PERSONS AND ARE NOT APPLICANTS.

This case turns on both statutory issues and issues of fact.  The statute governing issuance of FFLs, 18 U.S.C. § 923(d)(1), provides in relevant part:

> (d) (1) Any application submitted under subsection (a) or (b) of this section *shall be approved* if—
>
> (A) the *applicant* is twenty-one years of age or over;
>
> (B) the *applicant* (*including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n) of this chapter;*
>
> (C) the *applicant* has not willfully violated any of the provisions of this chapter or regulations issued thereunder;
>
> (D) the *applicant* has not willfully failed to disclose any material information required, or has not made any false statement as to any material fact, in connection with his application…."
>
> [(E) through (G) omitted]

This statute is mandatory.  ATF does not have discretion to deny an FFL

because in its opinion an individual or corporate entity should not have a license. Instead, the statute mandates that an application "shall be approved" by ATF if the seven requirements listed under subparagraphs (A) through (G) are met.[3]

Only three subparagraphs (subparagraphs (B), (C), and (D)) are directly applicable to this case. In denying MEW's application (JA 27), ATF's argument was as follows: On the application form (Form 7), ATF asks for certain information regarding any "responsible person" who has the power to direct the management, policies, and practices of the FFL's proposed operation. ATF contends that Teresa Walsh was a "responsible person" with respect to Mountaineer. In 2008, ATF asserts, Mountaineer "willfully" failed to list Teresa Walsh as a "responsible person" on the Form 7, allegedly in violation of 18 U.S.C. § 923(d)(1)(B). By doing so, the theory runs, Mountaineer violated 18 U.S.C. § 923(d)(1)(D), which provides that an application will be denied if the applicant has "willfully failed to disclose any material information required" in connection with his application. 18 U.S.C. § 923(d)(1)(D). That ostensible violation of 18 U.S.C. § 923(d)(1)(D), in turn, is therefore believed to justify denial of MEW's application under 18 U.S.C. § 923(d)(1)(C), because Mountaineer and Mark Walsh are said to have "willfully violated" the "provisions of this chapter or regulations issued

---

[3] The full text of § 923(d)(1) is in the Addendum.

thereunder."[4]

But a straightforward reading of the statute reveals that the Mountaineer application could not be denied by ATF even if Teresa Walsh had been listed.

**A.  The relevant statutes do not permit ATF to deny or revoke an application because a responsible person has previously been associated with a revoked FFL.**

By the express language of 18 U.S.C. § 923(d)(1)(B), an application may be denied if either the applicant or (in the case of a corporation, partnership, or association) any individual "possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association *is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n) of this chapter*."  (emphasis added).

Section 922(g) prohibits felons, persons who have been committed to a mental institution, drug addicts, individuals convicted of misdemeanor crimes of domestic violence, and several other classes of prohibited persons from transporting, shipping, possessing, or receiving firearms or ammunition in interstate or foreign commerce.  Section 922(n) prohibits persons who are "under indictment

---

[4] The Final Notice of Denial for MEW's application (JA 27 included, for the first time, a contention that Mark Walsh was a "willful violator" in connection with the Mountaineer license, even though the revocation of Mountaineer's license found *only Mountaineer* to have violated the GCA, not Mark Walsh individually.  JA 193.

for a crime punishable by imprisonment for a term exceeding one year" from shipping, transporting, or receiving firearms in interstate commerce.

These two sections do *not* include persons who may have previously been associated with an entity whose FFL has been revoked. Teresa Walsh is not a person described in either § 922(g) or § 922(n). Thus, under 18 U.S.C. § 923(d)(1)(B), ATF would not have had the statutory authority to deny Mountaineer's application, even if Teresa Walsh had been listed as a responsible person on that application. Even assuming that Teresa Walsh possessed "directly or indirectly, the power to direct or cause the direction of the management and policies" of Mountaineer (which she did not—see below), any omission of her as a "responsible person" on Mountaineer's application was not material, because it would not form the basis under the statute for denying Mountaineer's application. Accordingly, neither Mountaineer nor Mark Walsh "willfully failed to disclose any material information required" in violation of 18 U.S.C. § 923(d)(1)(D). As a further consequence, neither Mountaineer nor Mark Walsh committed any "willful violation of Chapter 44 under § 923(d)(1)(C)," because they did not violate that chapter at all.

Furthermore, ATF exceeded its authority in requiring that all responsible persons be disclosed on the Form 7, not just those who are disqualified from

22

shipping, transporting, or receiving firearms in commerce under §§ 922(g) and (n). The authority to issue the application form is found in 18 U.S.C. § 923(a), which states:

> The application shall be in such form and contain only that information necessary to determine eligibility for licensing as the Attorney General shall by regulation prescribe and shall include a photograph and fingerprints of the applicant.

Thus, the information requested by the application form must "contain only that information necessary to determine eligibility for licensing," *i.e.*, whether an applicant meets the criteria in subparagraphs A-G of 18 U.S.C. § 923(d)(1), and must be established by regulation. Because information about an individual who had previously willfully violated the chapter, but who is not an applicant, is not "information necessary to determine eligibility for licensing," the form may not request such information, and the failure to provide it is not a violation of 18 U.S.C. § 923(d)(1).

**B.  The district court erred in adding language to the statute regarding applicants and responsible persons.**

In the court below, MEW argued that § 923(d)(1) and its subparagraphs should simply be applied in accordance with their plain language, and that (d)(1)(B) is the only subparagraph to which the concept of "responsible person" is relevant. As noted above, any omission of Teresa Walsh as a "responsible person" is

23

therefore not material, because she was not a person disqualified under §§ 922(g) or (n) and, indeed, ATF has no authority to inquire about responsible persons who are not disqualified.

Nevertheless, the trial court undertook an analysis designed to expand the meaning of subsection (d)(1), without any warrant for doing so. After noting that there are seven subsections (subparagraphs, actually) in (d)(1), the court states that "Under MEW's theory, 'responsible person,' as that term is defined by ATF, cannot include anyone who falls under any of the other six subsections, and instead is solely a person within the purview of subsection (B)." JA 401. It is less than clear to MEW what that statement means. A person does not "fall under" the various subparagraphs of (d)(1). Rather, each subparagraph lists criteria that, if not met by the applicant, will result in the denial of the FFL application. All of them except (d)(1)(B) refer only to "the applicant;" in this case, Mountaineer.

The district court continued: "According to MEW, because Mrs. Walsh was not prohibited from transacting firearms under § 922(g) or (n), she was not a responsible person and therefore was properly excludable from Mountaineer's FFL application." JA 401. That is closer to MEW's argument. MEW contended that it was immaterial whether or not she was a responsible person, because an application cannot be denied under (d)(1)(B) unless the responsible person is disqualified under

24

§ 922(g) or (n).

The court then states:  "In considering MEW's argument, several principles of statutory construction are helpful."  JA 402.  The opinion then reviews cases and canons of statutory construction, including *noscitur a sociis*, *in pari materia*, and *expressium facit cessare tacitum*.  The court states that MEW applies the last of these maxims to "§ 923(d)(1) of the GCA to argue that Congress's inclusion of the parenthetical in subsection (B) demonstrates its intent to limit the potential liability of business applicants to that subsection."  *Id.*

But MEW never contended that "business applicants" do not have to meet all seven of the conditions of (d)(1).  Its argument was straightforward, as recited above, that a license cannot be denied under (d)(1)(B) unless the responsible person is disqualified under 922(g) or (n), that Teresa Walsh was not disqualified, that the language regarding responsible persons does not appear in 923(d)(1)(C) or (D), and that any failure to list her was not a material violation.  MEW asked only that the statute be applied as written.

But the court went on to create an ambiguity rather than resolve one, and added language to the statute where it does not appear.  The court quoted from *XVP Sports, LLC v. Bangs*, No. 2:11CV379, 2012 WL 4329263, at *8 (E.D.Va., Mar. 21, 2012), to the effect that: "[a]n equally reasonable construction of Section 923(d)(1)

25

is that Congress defined the term 'applicant' by including the parenthetical language in the statute's first mention of 'applicant' which addressed the issue of corporate entities, and thereafter intended to rely upon the same meaning for the defined term." In other words, the court expanded the definition of "applicant" to always include "responsible persons" no matter where the term "applicant" appears. The court concluded:

> Based on this analysis, MEW's arguments that the ATF lacks the statutory authority to require the disclosure of responsible persons, and that the term responsible persons, as defined by the ATF, excludes all persons not within the meaning of subsection (B) fail.

JA 403. Unpacking this statement, the court apparently means that subparagraphs (A) through (G) should all be read to include in the definition of "applicant" subparagraph (B)'s definition of "responsible person," but should not include subparagraph (B)'s limitation of responsible person to those who are disqualified under §§ 922(g) and (n). (If the court's redrafting of the statute were to include the limitation of responsible persons to those who are disqualified under §§ 922(g) and (n), MEW's arguments regarding immateriality and ATF's lack of authority to require disclosure would still prevail). This rewriting of the statute is unjustified for a host of reasons.

First, the statute doesn't say that. The statute as written is not ambiguous. Congress chose in subparagraph (B) to allow licenses to be denied if the applicant,

26

or persons with the power to direct the management and policies of a corporate entity, are prohibited from shipping, transporting, or receiving firearms under §§ 922(g) or (n).  In subparagraphs (C) and (D), Congress provided that licenses could be denied if the applicant had made material misstatements or omissions, or had committed a willful violation of the GCA.  Congress did not provide in (C) and (D) that the application must be denied if persons besides the applicant, with the power to direct the management and policies of a corporate entity, had made material misstatements or omissions, or had committed a willful violation.

Second, there is nothing difficult or impossible about enforcing the statute as written.  The only reason for judicially rewriting the statutory language is to impose restrictions greater than those imposed by Congress.  That is impermissible.  This Court has expressly addressed policy arguments of ATF related to the purported difficulties of enforcing the Gun Control Act: "The policy arguments forwarded by the Secretary with respect to enforcement 'should be directed to the Congress rather than to [the courts].' (citation omitted)." *National Rifle Ass'n v. Brady*, 914 F.2d 475, 485 (4th Cir. 1990). The same is true here.  If it is believed that a corporate entity should be prohibited from obtaining an FFL when the entity has a person associated with it who had previously been associated with a revoked FFL, that policy argument should be addressed to Congress, not the courts.

27

Third, there is something more artful than cogent in the *XVP* court's argument that "Congress defined the term 'applicant' by including the parenthetical language in the statute's *first mention of 'applicant' which addressed the issue of corporate entities*, and thereafter intended to rely upon the same meaning for the defined term." (emphasis added).  It is unsurprising that the parenthetical about persons with the power to direct the management of corporate entities first appeared in the section that addresses persons with the power to direct the management of corporate entities.  What this statement fails to note is that § 923(d)(1)(B) is the *only* segment in all of § 923, which deals with licensing generally, in which this language appears.  The term "applicant" appears approximately 20 times in § 923.  But the language relating to responsible persons does not appear in the several uses of "applicant" that precede § 923(d)(1)(B) or in the uses of "applicant" that follow it, either in (d)(1) or in other paragraphs. It is not a definition, but a substantive provision of the law that states that an application will only be granted if any responsible person, in addition to the applicant, is not an individual who is prohibited from shipping, transporting, or receiving firearms.

Fourth, if "applicant" is deemed always to include all responsible persons, that interpretation makes no sense in many other passages in § 923 in which the term is used.  For example, § 923(c) requires that the Attorney General "shall issue

28

to a qualified applicant the appropriate license…." Must the Attorney General issue a license to all responsible persons as well? Of course not, because there is only one applicant and, the district court to the contrary, the term does not include responsible persons except in (d)(1)(B). Subparagraph (F) of § 923(d)(1) allows approval of the application provided "the applicant certifies that—(i) the business to be conducted under the license is not prohibited by State or local law. . . ." Must every responsible person make that same certification in addition to the "applicant"? The application form promulgated by ATF has no place for responsible persons in addition to the applicant to make such a certification.

Section 923(d)(2) requires the Attorney General to issue or deny a license within 60 days, and if that does not occur, "the applicant may file an action under section 1361 of title 28 to compel the Attorney General to act." Can a person who is merely listed as a responsible person bring such a lawsuit in his own name to compel the Attorney General to issue a license? Clearly, only the actual applicant—the individual seeking a license as a sole proprietor, or the corporation or other entity actually applying for the license—could bring such an action. It is plain from these examples that the parenthetical in (d)(1)(B)—number two in a list of seven criteria that must be satisfied—is not a definition of "applicant" generally, but a substantive requirement that applies only in that subparagraph.

29

Fifth, 18 U.S.C. § 921 is entirely devoted to definitions of terms under the GCA. Had Congress wished to define "applicant" in the unusual manner in which the district court interpreted that term, it could have easily done so in the "definitions" section. It certainly wouldn't have inserted a definition, without identifying it as such, in the midst of substantive provisions governing the approval of licenses. Congress did not define "applicant" in § 921, so the rule that words in a statute are to be given their ordinary meaning applies here.[5] Webster's New World College Dictionary (4th Ed. 2006) defines "applicant" as "a person who applies for employment, help, etc." The relevant definition of "apply" is "to make a formal request (*to* someone *for* something)." *Id.* Here the limited liability company Mountaineer made a formal request *to* ATF *for* a firearms license, and it is the "applicant" in the ordinary signification of that word.

Sixth, if there were any ambiguity here as to whether responsible persons are included within the term "applicant" (which they plainly are not), ATF could have at least attempted under its rulemaking power to issue clarifying regulations. *See* 18 U.S.C. § 926. But ATF did not. Instead, it included in 27 C.F.R. § 478.47(b)(2) (under the general heading "Issuance of license") language that is identical to §

---

[5] "The ordinary meaning rule is the most fundamental semantic rule of interpretation…. Interpreters should not be required to divine arcane nuances or discover hidden meanings." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*, 69 (2012).

923(d)(1)(B).

Seventh, it is entirely logical for Congress to have included in only one of the seven subparagraphs, and to be effective only for that subparagraph, the language that forbids approval of an application if an individual who can direct the management of a corporate applicant is one who is prohibited from shipping or receiving firearms. The very purpose of a federal firearms license is to allow the licensee to ship and receive firearms in commerce. Subsection 923(a) states that the license "*shall entitle the licensee to transport, ship, and receive firearms* and ammunition covered by such license *in interstate or foreign commerce.* (emphasis added). It is entirely logical that Congress would proscribe persons who are legally forbidden from shipping and receiving firearms from being able to direct the management of corporate entities seeking a license to do just that. The parenthetical in § 923(d)(1)(B) has no application outside that context.

The trial court next engaged in a mistaken, and contradictory, line of argument. The opinion states:

> [T]he term "applicant," as used in each of the seven subsections of § 923(d)(1), must mean either the corporate entity on whose behalf its agent applies, or the individual who signs the application. It is clear that Congress intended to assign the latter definition to the term "applicant."

JA 403-04. The Court then concludes:

Mr. Walsh was the individual who applied on behalf of Mountaineer and MEW. Therefore, for purposes of § 923(d)(1) he is "the applicant," and assuming *arguendo* that Mrs. Walsh was a responsible person, he, not Mountaineer, is a willful violator of the GCA.

This conclusion is deeply erroneous, for several reasons. First, the trial court had just finished arguing that "applicant" meant (in the case of a corporation or other entity) the entity itself, *plus* any individual with the power the power to direct the management and policies of the entity.[6] Now the court concludes, contrary to that prior argument, that "applicant" means only the individual who signs the application. That would also mean that there could never be a corporate entity "applicant"—which in turn means that the parenthetical in subparagraph (B) could never apply, because (B) applies *only* where the applicant is a corporation, partnership, or the like.

Second, the district court's justification for adopting a rule that "applicant" means "the individual who signs the application," rather than the entity that is actually applying for a license, rests on only two points, neither of which is valid. The court contends that:

First, subsection (A) requires the applicant to be at least twenty-one years old. It is inconceivable that Congress premised the approval of a

---

[6] *See also* JA 408, where the court confirms that "this Court has already determined" that "the word 'applicant' within the statute is a defined term whose definition includes the parenthetical language of subsection (B)." That necessarily involves "applicants" that are corporations or similar entities.

> corporation's FFL application on a corporate existence of twenty-one
> years. In any event, were that Congress's intent, MEW's application
> would be properly denied.

JA 404.  But the obvious, common-sense reading of subparagraph (A) is that if the

applicant is an individual or sole proprietor, he or she must be twenty-one.  If an

entity, the entity does not have to have been in existence for twenty-one years—the

provision simply doesn't apply.  It does not mean that the "applicant" must always

be an individual.

The only other argument the court musters for this reading is that "subsection

(B) explicitly contemplates 'any individual' applying on behalf of the corporation,"

and the unremarkable proposition that corporations must act through agents.  JA

404.    But this misconstrues subparagraph (B), which when referencing

"individuals" is not talking about who *signs* the application.  Rather, subparagraph

(B) provides that when the applicant is an entity (without reference to who signs),

individuals with the power to direct its management must not be convicted felons,

drug addicts, or others disqualified under § 922(g) or (n).

These two strained interpretations of "applicant" are unjustified.  The first--

that "applicant" always includes "responsible person"--improperly expands the

definition of "applicant" so that persons previously associated with a revoked FFL

cannot be "responsible persons." The second--that "applicant" means the individual

33

who signed the application--changes the statutory meaning of "applicant" so that persons such as Mark Walsh are treated as "applicants" when they are not. Neither of these readings is permissible, and the court's legal analysis based on them must fail.

## II. THE EVIDENCE OF RECORD DID NOT ESTABLISH THAT TERESA WALSH WAS AN OWNER OR RESPONSIBLE PERSON.

### A. Teresa Walsh was indisputably not an owner of Mountaineer.

Mountaineer's license was revoked, according to ATF's Final Notice, on the grounds that:

> The inspection disclosed that *Teresa Walsh (*formerly Teresa Snyder) *is an owner* and responsible person of Mountaineer Gun, yet was intentionally not listed as such by Mountaineer Gun on its application, ATF Form 7, as is required. By *intentionally failing to list Teresa Walsh as an owner* and responsible person on ATF Form 7, Mountaineer Gun willfully failed to disclose material information on the application.

JA 194 (emphasis added).  This wrongful assertion by ATF that Teresa was an owner of Mountaineer has tainted these proceedings throughout.  Even though the evidence in the MEW informal hearing established beyond all doubt that she was not an owner, ATF continued to incorrectly assert that she was an owner of Mountaineer in the MEW Final Notice of Denial.  JA 28.

But she was not an owner.  Mountaineer was organized as an LLC under West Virginia law.  JA 218.  (An LLC technically has "members" rather than

34

"owners" but, for practical purposes, the members are equivalent to owners.)[7]  The Articles of Organization filed with the West Virginia Secretary of State conclusively established that Teresa Walsh was not a "member" of Mountaineer and thus was not an owner.  *Id*. Mark Walsh also stated under oath that she was not and never had been a member.  JA 20.

What was the factual basis on which ATF Investigator Malaskovitz reported that Teresa Walsh was an "owner" of Mountaineer?   According to him, an employee of Mountaineer, Peggy White, was under the "impression" that Teresa was an owner.  JA 113.  But Mark Walsh never discussed with employees who owned the business. JA 155.  Investigator Malaskovitz conceded that he did not know why Peggy White was under impression that Teresa Walsh was an owner of Mountaineer—he never asked her why. JA 115-16.  He didn't know if Peggy White had reviewed any financial records in that regard.  *Id*.  He himself did no review of Mountaineer's finances to determine if Teresa Walsh had any ownership interest. JA 110.  In fact, Malaskovitz testified at the hearing that *he did not know whether Teresa Walsh had any ownership interest* in Mountaineer. *Id*.  Yet Mountaineer's license was revoked, and MEW's license was denied, based on his assertion that she

---

[7] *See* W. Va. Code § 31B-2-201 ("A limited liability company is a legal entity distinct from its members"); W.Va. Code § 31B-2-202(a) ("One or more persons may organize a limited liability company, consisting of one or more members").

35

was an owner.

## B. The district court improperly determined that Teresa Walsh was a responsible person for Mountaineer.

### 1. Teresa Walsh had no legal power to direct, or cause the direction of, the management and policies of Mountaineer.

Mark Walsh was the sole member of Mountaineer Gun Sales, LLC.  JA 20, 218.  Teresa Walsh was not a member, owner, officer, or director of Mountaineer. JA 218; JA 20-21.   Under W. Va. Code § 31B-4-404, in a member-managed company, which is what Mountaineer is (JA 218), the only persons who possess the power to direct, or cause the direction of, the management and policies of an LLC are the members:

(a) In a member-managed company:

(1) Each member has equal rights in the management and conduct of the company's business; and

(2) Except as otherwise provided in subsection (c) of this section or in section 8-801(b)(3)(i), any matter relating to the business of the company may be decided by a majority of the members.

West Virginia Code § 31B-4-404.  Mark Walsh is the only person with the legal power to direct the management and policies of Mountaineer.

There was also no evidence that she had legal corporate ownership or control over Mountaineer indirectly.  Instead, the evidence showed that she did not.  ATF

36

Investigator Malaskovitz testified that Teresa Walsh was a member of Mountaineer Country Rentals, LLC (the landlord for Mountaineer) (JA 114), but offered no evidence concerning ownership or control by Mountaineer Country Rentals over Mountaineer.  JA 115.  Mark Walsh testified, however, that Mountaineer pays rent to Mountaineer Country Rentals, LLC (JA 122) and that Mountaineer Country Rentals, LLC has no control, directly or indirectly, over Mountaineer. JA 154.

      *2.  The evidence relied on by ATF and the district court does not establish that Teresa Walsh had the power to direct or cause the direction of the management and policies of Mountaineer.*

The Memorandum Opinion states that:

> [T]his case turns entirely on whether Mrs. Walsh was a responsible person. In determining that she was a responsible person, the ATF relied on ten findings in its Final Notice of Revocation to Mountaineer.

JA 412.  That statement is not quite accurate, because the case may also turn on 1) whether ATF could require disclosure of any responsible person who is not disqualified under §§ 922(g) and (n), and if it could, whether such non-disclosure is "material"; 2) whether the district court improperly expanded the meaning of "applicant" in all sections where that word appears, as opposed to limiting it to where it does appear in § 923(d)(1)(B); and 3) whether any violation by Mark Walsh or Mountaineer was willful.  But it is true that if Teresa Walsh was not a responsible person for Mountaineer, summary judgment should have been granted

37

to MEW.  If there are factual issues to be resolved in deciding whether she was a responsible person, summary judgment in favor of ATF should also have been denied.

The District Court's Memorandum Opinion relies on ten assertions or pieces of evidence to establish that Teresa Walsh was a responsible person for Mountaineer. JA 412-15.  These are built upon ten findings by ATF from the MEW Final Notice of Revocation (JA 29-30), but have been expanded and revised by the district court.  They are addressed here seriatim as indented quotations, and each numbered finding is quoted verbatim:

> *First,* that Mrs. Walsh's FFL was revoked when she sold firearms out of TGS Sporting Goods. This fact is undisputed. The record includes the ATF's Final Notice of Revocation sent to TGS on January 23, 2006, with an effective revocation date of February 10, 2006. (Dkt. No. 15–8 at 7).

It is, indeed, undisputed that TGS Sporting Goods' FFL was revoked.  But that does not give Mrs. Walsh "the power to direct or cause the direction of the management and policies of" Mountaineer Gun Sales, LLC, which is the issue under discussion.  It is also not relevant or material, since no statute authorizes ATF to revoke or deny an FFL because a responsible person has been associated with a different revoked FFL.  *See* discussion in Part I. A., above.

> *Second,* that Mrs. Walsh had urged Mr. Walsh to apply for an FFL on behalf of Mountaineer, and that 91% of Mountaineer's inventory

consisted of former TGS inventory. The agency further found that Mr. Walsh lied to Inspector Malaskovitz regarding his knowledge of his wife's prior revocation. Although Mr. Walsh testified that he had the idea "to get things going" with Mountaineer (dkt. no. 15–5 at 9), he never refuted the ATF's finding that his wife urged him to apply for Mountaineer's FFL. Regarding the inventory, Mr. Walsh openly admitted that "379 firearms [ ] were transferred to Mountaineer from TGS." (Dkt. Nos. 11–7 at 2, 15–5 at 12, 11–4). There is, however, contradictory evidence in the record regarding the ATF's assertion that Mr. Walsh lied to Inspector Malaskovitz; Mr. Walsh testified he did not recall making a false statement. (Dkt. No. 15–5 at 34–35).

The Court states that there was conflicting evidence as to whether Mrs. Walsh "urged Mr. Walsh to apply for an FFL," as ATF contended on the basis of hearsay evidence from an adverse witness (JA 64), by noting Mr. Walsh's direct testimony that it was his idea "to get things going." *See* JA 124. But it doesn't matter whose idea it was. Either way, it does not give Mrs. Walsh "the power to direct or cause the direction of the management and policies of" the corporate entity.

Whether "91% of Mountaineer's inventory consisted of former TGS inventory" also proves nothing. First, this was only the case at the outset of Mountaineer's business. JA 236-252. Second, when TGS closed down, that inventory had to go somewhere, but that does not give Teresa Walsh the power to direct the management of whoever obtained them. Third, the uncontradicted evidence was that Mr. Walsh *bought those guns from her*, or at least gave her a

large down payment on them.  JA 127-28; 288.  The uncontradicted evidence was also that those firearms were obtained by Mountaineer pursuant to a written consignment agreement.  JA 21.

Regarding the contention that Mr. Walsh lied to Investigator Malaskovitz, the court again admits (see above) that the testimony was in conflict.  Accordingly, this alleged fact cannot support summary judgment.  Even if Mr. Walsh did lie, which he says he did not, it also does not make Teresa Walsh a responsible person for Mountaineer.

> *Third,* that Mr. Walsh exaggerated his involvement in the sale of firearms during the inspection, as evidenced by his full time job with a different company and the firearm sale/transfer forms, none of which include his name. When asked during the hearing whether he completed the forms, Mr. Walsh admitted that he did not; rather, his wife did. (Dkt. No. 15–5 at 11, 21). He further admitted that, because of his full-time job, he was not present at Mountaineer during the weekdays between 9:00 a.m. and 4:00 p.m., and he conceded that gun sales took place while he was not there. (Dkt. No. 15–5 at 15, 22–23). Even though Mr. Walsh stated that he sold the firearms during evenings and weekends, when, he contended, most of the sales took place, he acknowledged that Mrs. Walsh had sold firearms on at least "one or two occasions." (Dkt. No. 15–5 at 23).

But it simply doesn't matter to the "responsible person" issue whether Mr. Walsh *ever* "sold" firearms, or whether Mrs. Walsh did.  The act of selling a firearm to a customer, and processing the paperwork, is precisely what *clerks* do in a retail firearms dealership.  Selling a firearm to a customer does not give that

40

individual the power to direct the management and polices of the entity.  Filling out the Form 4473s and transferring the firearm can be done by a clerk.  Investigator Malaskovitz testified, with specific reference to Mrs. Walsh, that "as a store clerk, she could certainly handle the – the transfers of the -- of the forms, the transfers of the firearms . . . ."  JA 105; *see also* JA 77, 104.

Filling out the Form 4473 is a rigid, formal, mechanistic process.  As one can see from the Form 4473 itself (*see, e.g.,* JA 274-76), the form contains highly detailed, mandatory instructions which must be followed under penalty of felony charges.  Completing the Form 4473 is a very paradigm of a ministerial task involving no discretion.  It is about the furthest thing away from directing the management and policies of an organization as can be imagined.  The fact that some firearms sales took place while Mark Walsh was not present also proves nothing about who is directing the management and policies of Mountaineer.

Walmart sells firearms at thousands of stores across the United States.  The clerks who stand behind the counter, sell firearms to customers, and process the paperwork—one can be quite certain—are not the individuals who possess the power to direct the management and policies of Walmart.  Conversely, it is unlikely that one will find the President and CEO of Walmart, and the members of its Board of Directors, standing behind that counter and performing those tasks.

41

Even if who completed the sales did matter, the record shows that Mr. Walsh worked at the store for 3-5 hours on weekdays, all day Saturday and Sunday, and most vacation days, and on federal holidays. He was there for a total of 30-40 hours a week. JA 20, 124, 130, 156. The reason why he didn't fill out the Form 4473s (apart from the fact that he didn't need to, and that's not what people who are directing an enterprise necessarily do) was also brought out in his testimony: he had trouble hearing people on the phone, so that Teresa Walsh would call in transfers to the FBI and complete the Forms 4473 for sales by Mark Walsh. JA 136-37.

> *Fourth,* that Mr. Walsh admitted that his wife ran the firearms business. Although there is no such express admission, Mr. Walsh nevertheless admitted that Mrs. Walsh placed the orders for inventory with wholesalers, helped tag and log the firearms, showed guns to customers, called in sales to the FBI, filled out the firearm transaction forms, and completed the acquisition and disposition recordbook. (Dkt. No. 15–5 at 11–12, 20–22).

There is no such admission, so that cannot be relied on to support summary judgment. In fact, Mr. Walsh specifically denied that he ever made such a statement. "I did not inform the ATF investigator that Teresa Walsh ran Mountaineer's firearms business." JA 21. At best, there is a direct conflict in testimony about the facts, which precludes summary judgment for ATF.

Most of the other items in this list of tasks have already been addressed

42

above, such as showing guns to customers, filling out the transfer paperwork, and calling in the background check to the FBI. "Logging in" the firearms is the same as making entries in the Acquisition and Disposition record book. It is also a purely clerical task, involving writing down information such as the manufacturer, model, serial number, date, and from whom the firearm was received in a specified format. JA 236. Even so, the testimony was not that Teresa usually performed this ministerial task. The undisputed testimony by Mr. Walsh was that "most of the time I did" the logging in, and that occasionally Mrs. Walsh would help. JA 135. He also did most of the tagging. JA 135-36.

The finding that Teresa Walsh "placed the orders for inventory with wholesalers" is also directly contradicted, if that statement is meant to imply that Teresa had the power to determine what firearms would be ordered. Mark Walsh testified that *he* selected which firearms he wanted to sell, by looking through the gun books of the wholesalers. JA 135. Based on his decisions, Teresa Walsh placed orders "during the daytime because she's -- I'm not there during the day . . . to deal with the wholesalers." JA 135; *see also* JA 21.

> *Fifth,* that Mr. Walsh intentionally omitted his wife's name from Mountaineer's FFL application. MEW does not dispute this. When asked why his wife's name did not appear on the application, Mr. Walsh responded "for the fact that she wasn't able to be involved in sales of guns." (Dkt. No. 15–5 at 10). Whether or not this was done surreptitiously, as the ATF suggests, can only be determined based on

43

the other facts of the case.

This alleged fact might be important if it were true.  But it is plainly in error.

Mr. Walsh was not asked why her name did not appear on the *FFL application*; the

question was why she was not part of the *Mountaineer LLC*.  The full question and

answer are:

> Q. And why was Teresa not put *on the LLC* for Mountaineer Gun Sales?
>
> A. Well, for the fact that she wasn't able to be involved in sales of guns and *that was the company I was going to run.* (emphasis added).

JA 125.

> *Sixth,* that Mrs. Walsh ran the firearms business. As already noted in the ATF's fourth finding, although Mr. Walsh denies that his wife ran the firearms business, he has admitted that she performed most of the functions necessary for its operation.

This point has indeed already been discussed under the fourth finding, above.

As to the additional point that Mr. Walsh has "admitted that she performed most of

the functions necessary for its operations," Mr. Walsh did not make any such

admission.  He specifically denied that she had the powers that would make her a

responsible person:

> As I understood ATF's policy regarding who is a "responsible person," Teresa Walsh was not a "responsible person" because she did not have the power to direct or cause the direction of the management and policies of Mountaineer with respect to firearms. The FFL Newsletter of March 2006 stated, that, for a corporation, "only the directors and

44

officers who direct the management and policies of the corporation or association with respect to firearms would be considered responsible persons.  In most firearms businesses, the store manager would be a responsible person." Teresa Walsh is not a director or officer of Mountaineer and she is not the manager of the firearms business.

JA 21.

> *Seventh,* that Peggy White ("Ms. White"), a Mountaineer employee, told Inspector Malaskovitz that he should speak to Mrs. Walsh regarding firearms because Mrs. Walsh was the "owner." MEW has not denied that Ms. White made this statement; in fact, Mr. Walsh stated he was not surprised to hear Ms. White had done so. (Dkt. No. 15–5 at 40). [footnote omitted]

Why it would be asserted, at this stage of the proceedings, that Mrs. Walsh was "the owner" of Mountaineer is difficult to fathom.  She was not the owner, and never had been the owner.  That fact has been established about as positively as a fact can be established.  *See* Part II. A., above.

> *Eighth,* that Ms. White was not the manager of the firearms business, as Mrs. Walsh had identified her to Inspector Malaskovitz. It is undisputed that "Peggy White was not the gun manager." (Dkt. 11–2 at 2).

The statement that Mrs. Walsh had identified Peggy White to Investigator Malaskovitz as the manager of the firearms business is simply incorrect. Investigator Malaskovitz did not testify that Peggy White was already the manager, or that Mrs. Walsh had told him she was.  Here is the exchange between counsel and Investigator Malaskovitz regarding what Mrs. Walsh told him:

45

Q:  … And didn't she also tell you that Ms. White was going to begi –
be the gun manager?

A:  Yes.

Q: And didn't she, in fact, show you the responsible person form and
fingerprints that had just recently been completed for Ms. White and it
had not yet, in fact, been sent in yet?

A:  Yes.

JA 77-78.   Mrs. Walsh did not assert that Peggy White was currently the gun

manager.   More importantly, even if Peggy White was "not the manager" of the

firearms business, that does not make Mrs. Walsh the manager, or a responsible

person.   There is no requirement that a firearms dealership have a "gun manager,"

and no evidence that Mrs. Walsh had that title or performed those functions.   In

fact, Mr. Walsh stated under oath Teresa Walsh is "not the manager of the firearms

business."  JA 21.

> *Ninth,* that Mrs. Walsh could hire employees, had signing authority on
> Mountaineer's checking account, and signed employee paychecks.
> MEW admitted that "both Mark Walsh and Teresa Walsh had signing
> authority for employee paychecks." (Dkt. No. 11–2 at 2). However,
> Mr. Walsh contests the ATF's assertion that his wife could hire
> employees. (Dkt. No. 15–5 at 18–19). Nevertheless, he has admitted
> that his wife acted as the human resources department of the business,
> because she "does the payroll and deal[s] with the custom—or the
> employees." (Dkt. No. 15–5 at 36).

The first sentence cites no evidence in the record.  The statement that Mrs.

46

Walsh could hire employees is incorrect. Mark Walsh stated in his sworn declaration that Teresa Walsh did not have the authority to hire employees. JA 21. She could suggest someone as an employee and, if he agreed, he would give her permission to hire the person. JA 21. Mark Walsh also testified during the hearing that he selected employees himself and instructed Teresa Walsh "to hire them"; Teresa Walsh could take employment applications, but not hire employees without his permission. JA 133-34. He further testified that only he fired employees from the firearms business; her only role in firing employees may be to "relay it to them." JA 134. All hiring and firing, in short, was decided by Mark Walsh. If Teresa had any role, it was as messenger. He "directed" that part of the management of the LLC, and she carried out those directions.

All of the rest of the court's assertions above have to do with signing paychecks. Both Mr. and Mrs. Walsh could sign employee paychecks. JA 117. There was no testimony that Mrs. Walsh signed any other kind of checks other than paychecks, or made the decisions resulting in any other kinds of checks being issued. Signing paychecks is a routine task. While it is important that the person who does so be honest and trustworthy, there is no discretion involved, and it does not constitute the power to direct the management or policies of the corporate entity.

47

*Tenth,* that Sherri Flint ("Ms. Flint"), a Mountaineer employee, lied to Inspector Malaskovitz about Mrs. Walsh's role in the gun business when she told him that Mrs. Walsh had nothing to do with it. MEW has not denied that Ms. Flint made such a statement to Inspector Malaskovitz. Moreover, it has admitted that Mrs. Walsh was quite involved in the gun business, even though she did not hold the title of gun manager. Therefore, the ATF correctly found that Ms. Flint's statement was false.

There is an error of logic here.  Just because Sherri Flint lied when she told Investigator Malaskovitz that Mrs. Walsh had "nothing to do" with the gun business, does not mean that Mrs. Walsh directed the management of the gun business.  All it means is that Mrs. Walsh had *something* to do with the gun business, which has never been disputed.  The alleged admission by MEW that Mrs. Walsh was "quite involved" is not an admission by MEW; it is just the court's characterization.

The question is whether Teresa Walsh possessed "the power to direct or cause the direction of the management and policies" of MEW.  There is not a single item in these ten findings that indicates that she had that power.  She performed certain clerical and ministerial tasks.  All important decisions were reserved to be made by Mark Walsh.  Furthermore, the power to make many or most important decisions could legally be made only by Mark Walsh, since he was the sole member of the LLC.

48

The undisputed facts show that Mark Walsh, not Teresa, had the power to direct the management and policies of MEW.  Summary judgment should have been granted to MEW.  To the extent that there is any factual evidence at all that Teresa had the power to do so, it was strongly disputed by MEW, and the summary judgment granted to ATF on this issue should be reversed.

## III.  EVEN IF TERESA WALSH WAS A RESPONSIBLE PERSON AT MOUNTAINEER, ANY OMISSION TO DISCLOSE HER ON THE MOUNTAINEER APPLICATION WAS NOT A WILLFUL VIOLATION.

To support a revocation under 18 U.S.C. §§ 923(d)(1)(C) or (d)(1)(D), any violation must be "willful."  Willfulness is a question of fact.  As stated in *American Arms International v. Herbert*, 563 F.3d 79, 83 (4th Cir. 2009) ("*AAI*"), "A federal court reviewing such a revocation may grant summary judgment 'if no genuine issue of material fact exists about whether [the licensee] willfully violated an applicable statutory or regulatory provision.'" (quoting *Armalite, Inc. v. Lambert,* 544 F.3d 644, 647 (6th Cir.2008)).

In *Prino v. Simon*, 606 F.2d 449, 451 (4th Cir. 1979), this Court adopted the following definition of "willful" with respect to an FFL revocation case:

> "(W)illful" means action taken knowledgeably by one subject to the statutory provisions in disregard of the action's legality.  No showing of malicious intent is necessary.  A conscious, intentional, deliberate, voluntary decision properly is described as willful, "regardless of venal motive."

49

More recently, this Court in *AAI* has reaffirmed the *Prino* standard, and endorsed a generally similar standard announced in the case of *RSM, Inc. v. Herbert*, 466 F.3d 316 (4th Cir.2006). In *AAI*, 563 F.3d at 83, this Court quoted *RSM*'s test of willfulness as follows:

> "Rather, *a more general knowledge `that the conduct is unlawful is all that is required.*'" Id. (quoting *Bryan v. United States*, 524 U.S. 184, 196, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998)). Moreover, we recognized that the willfulness requirement could be satisfied by showing "a disregard of or an indifference to *known legal obligations.*" Id. "Thus when determining the willfulness of conduct, we must determine whether the acts were committed *in deliberate disregard of, or with plain indifference toward, either known legal obligations or the general unlawfulness of the actions*." *Id.* at 321-22. (emphasis added).

As shown above, there is no prohibition against a person who has previously been associated with a revoked FFL later becoming a responsible person for a different licensee. The evidence in this case also shows that Teresa Walsh did not meet the definition of "responsible person." But even if it should now be determined that she did, there is no factual evidence, and no finding by the trial court, that Mark Walsh or Mountaineer deliberately disregarded that definition, or knew that that the tasks she performed as a clerk would violate that definition or be unlawful.

To establish willfulness, ATF generally first conducts an inspection, cites the FFL for violations, and requires that the violations be rectified, but does not revoke

the license. *See, e.g., AAI*, 563 F.3d at 79-80, 84-85 (4th Cir. 2009); *Mershimer v. Bowers*, 395 Fed.Appx. 993, 995 (4th Cir. 2010); *Prino v. Simon*, 606 F.2d 449, 450 (4th Cir. 1979). That establishes that the FFL is aware of its obligations under the law, and how to correct any problems. Frequently, a warning letter is issued, or a warning conference is held with an ATF official. *AAI*, 563 F.3d at 80, 84 (4th Cir. 2009), *Mershimer*, 395 Fed.Appx. at 995; *Prino*, 606 F.2d at 450.

If the FFL continues to commit violations of the same kind, an inference may be warranted that those later violations were willful, because the FFL was aware of the law and its obligations, but chose to disregard them. *AAI*, 563 F.3d at 84-85; *Mershimer*, 395 Fed.Appx. at 995-96; *Prino*, 606 F.2d at 451. Often, the repeated violations run into the hundreds, and can involve such matters as firearms being missing from inventory and being unaccounted for. *AAI*, 563 F.3d at 80; *Mershimer*, 395 Fed.Appx. at 995-96.

Although the district court used the word "willful" in several places, the court did not make an express finding that any ostensible violation was "willful," and did not discuss any evidence showing that any violation by Mr. Walsh was "willful." The only record evidence regarding willfulness cited by the court was in its "Fifth" finding discussed above, where it was said that "Mr. Walsh intentionally omitted his wife's name from Mountaineer's FFL application," ostensibly because of her

inability to be involved in gun sales.  JA 414.  But as described in Part II. B. 2., above, that finding was an error. Mr. Walsh was not asked why her name did not appear on the *FFL application*; the question was why she was not put on the *Mountaineer LLC*.  Far from showing that Mr. Walsh or Mountaineer were aware of their obligations and willfully violated them, this testimony shows an intention that Mr. Walsh was attempting to comply with the law as he understood it.[8]

There was also no evidence that anyone from ATF informed anyone at Mountaineer as to the proper definition of "responsible person," or that the Walshes were aware that ATF would adopt an interpretation that is so expansive and, candidly, in conflict with the governing statute.  ATF has cited no guidance that it has issued regarding what is required to be a responsible person, and what is required to avoid it, apart from the parenthetical language of (B) which is reproduced in part on the Form 7.  What ATF guidance Mr. Walsh is now aware of indicates that Teresa Walsh was not a responsible person for Mountaineer.  JA 21.

The record here is simply devoid of evidence showing that any violation, if

---

[8] This is a key misreading of the evidence.  In the "Conclusion" of the opinion, setting forth the fundamental reasoning for reaching its conclusion, the district court stated: "*Mr. Walsh admitted that he intentionally omitted her name from the FFL application because of her prior revocation. By so doing, he became a willful violator of the GCA under 18 U.S.C. § 923(d)(1)(C) and (d)(1)(D).*" (emphasis added).  But no evidence is cited to support this statement, and it is apparently based only on the single, erroneous citation discussed above.

one existed at all, was "willful." Because proof of a willful violation by Mr. Walsh in connection with Mountaineer is an essential element of the government's case, summary judgment should have been granted to MEW.

## IV.   THE *CASANOVA GUNS* "SUCCESSOR IN INTEREST" TEST DOES NOT APPLY.

The district court believed that the case of *Casanova Guns, Inc. v. Connally*, 454 F.2d 1320 (7th Cir. 1972), would provide "helpful guidance" in the court's analysis. JA 404. For reasons discussed below, the actual holding of the court in *Casanova Guns* aligns with MEW's straightforward reading of § 923(d)(1). The part relied on by the district court was surplusage in the Seventh Circuit's opinion, and would be surplusage here.

The district court begins by stating that "The Seventh Circuit affirmed the district court on two grounds: (1) Casanova Guns was a successor-in-interest to Casanova's; and 2) the intent behind the formation of Casanova Guns was to circumvent the GCA." JA 405. But that is not what the Seventh Circuit held. Instead, its actual holding relied on a direct application of § 923(d)(1)(**B**), because that subparagraph, relating to felons not being able to direct the management of a corporate applicant, applied in that case.

There were two separate legal analyses underpinning the opinion in *Casanova Guns*. The first, applying § 923(d)(1)(B), was necessary to the decision

53

of the case, in accord with federal statute governing FFLs, and unremarkable. It also does not apply to the case at bar. The second, involving a "successor in interest" analysis, was not necessary to the decision of that case, disregards principles of corporate law that ordinarily apply, does not derive from the federal statutory scheme for regulation of FFLs (and would indeed displace it), and is not apposite to the facts and law involved in the instant case.

**A.    To the extent that *Casanova Guns* applies the terms of the federal licensing statute to the facts in that case, it is not relevant to the case at bar.**

In *Casanova Guns*, the original holder of the FFL was "Casanova's, Inc." *Casanova Guns,* 454 F.2d at 1322. After Casanova's Inc. was indicted for possession of unregistered firearms (that is, firearms such as machine guns, short-barreled rifles, or short-barreled shotguns that must be registered under the National Firearms Act of 1934), but before it was convicted, "Casanova Guns, Inc." was organized as a separate corporation. It obtained an FFL, and ultimately took over the firearms business of Casanova's Inc. *Id.* Approximately two years later, after having operated as an FFL for a period of time, a renewal application for Casanova Guns, Inc. was denied by ATF. *Id.*

The controlling statute in *Casanova Guns* was 18 U.S.C. § 923(d)(1)**(B)**. The Seventh Circuit stated that "the license was denied because of Casanova Guns' relationship with Casanova's, Inc. . . . a convicted felon." *Id.* at 1322. The Court

54

stated that "The Gun Control Act prohibits the issuance of federal firearms licenses to convicted felons *and to companies directed or controlled by convicted felons*," citing 18 U.S.C. § 923(d)(1)**(B)** (emphasis added).

The Court concluded that even though Casanova Guns was not a convicted felon, "the express language of the licensing act" (that is, § 923(d)(1)**(B)**) "explicitly prohibits the issuance of a license to a convicted felon *or to a corporation, partnership or association over which a convicted felon exercises or could exercise control." Id.* (emphasis added). The Seventh Circuit characterized its task as reviewing "the finding that Casanova's controlled Casanova Guns." *Id.* After reviewing the evidence, the Court determined that sufficient control by the felon Casanova's existed to disqualify Casanova Guns under § 923(d)(1)(B). *Id.* at 1323.

This first analysis is neither relevant nor controlling with regard to MEW or Mountaineer. Neither Teresa Walsh (for purposes of the Mountaineer revocation) nor Mark Walsh (for purposes of the MEW application) is a convicted felon or other prohibited person under § 922(g) or (n). But it is clearly the main holding of the Seventh Circuit in *Casanova.*

55

**B.    To the extent that *Casanova Guns* disregards corporate entities, the facts differ from those in the case at bar and the reasoning would be surplusage.**

After the straightforward statutory application of subparagraph 923(d)(1)(B) to the facts before it, the Seventh Circuit took a further step, and stated that it is "well-settled" that "the fiction of a corporate entity must be disregarded whenever it has been adopted or used to circumvent the provisions of a statute." *Casanova Guns*, 454 F.2d at 1322. This is the "second analysis" referenced above, and to which the district court was referring. Whether that proposition is "well-settled" is perhaps disputable. The accepted and generally applied rule is the "basic proposition that a corporation is a legal entity separate and distinct from its shareholders." *Perpetual Real Estate Services, Inc. v. Michaelson Properties, Inc.*, 974 F.2d 545, 547-48 (4th Cir. 1992). That is expressly the law in West Virginia regarding LLCs. W. Va. Code § 31B-2-201 ("A limited liability company is a legal entity distinct from its members.").

But even if the existence of separate corporations can sometimes be disregarded, such an approach was complete surplusage to the Seventh Circuit's decision in *Casanova Guns*. As described above, the Seventh Circuit had an entirely adequate, statutory basis for holding that the application of Casanova Guns

56

could be denied; namely, the express language of subparagraph 923(d)(1)(B). Indeed, the court seemingly agreed that the statutory analysis was sufficient. After going through the statute, and noting that "the statute explicitly prohibits" the issuance of a license to a corporation controlled by a felon, the Court stated, "*Additionally*" the corporate entity could be disregarded. *Id*. at 1322 (emphasis added).

But it could only be disregarded, according to the Seventh Circuit, when a corporate entity "has been adopted or used to circumvent the provisions of a statute." *Id.* The Court believed that the purpose of the incorporation of Casanova Guns, Inc. was "the circumvention of the statute restricting issuance of firearms licenses to convicted felons." *Id.* at 1323.

By the time the application was denied in *Casanova Guns* it was a *fact* that Casanova's Inc. was a convicted felon. Licenses can't be issued to felons, so it may have been plausible for the Court to view the incorporation of Casanova Guns as an attempt to circumvent that prohibition. But here, neither Mark Walsh nor Teresa Walsh is a felon. Most importantly, it had not been determined by any court, or even by ATF in the Mountaineer revocation, that Mark Walsh was a "willful violator" of the GCA by allegedly failing to disclose Teresa Walsh as a "responsible person" of Mountaineer.

57

In addition, Casanova Guns was up and running as an FFL when its renewal application was denied. There was thus a considerable factual record as to how that corporation in fact operated with respect to the prior, felonious corporation. Here, MEW Sporting Goods LLC basically remains a shell. It has never operated as an FFL, or in any other capacity. It does not own the firearms formerly owned by Mountaineer—it owns nothing at all. Thus, even if the second analysis in *Casanova Guns* were to be applied, there is no evidence in the record to conclude that it has operated as the alter ego of Mountaineer, because it has not operated at all.

Most importantly, by its own terms the second analysis in *Casanova Guns* can only be applied when there is an attempt to "circumvent" the terms of a statute. In the case at bar, if it is found that § 923(d)(1)(D) requires disclosure of responsible persons even when they are not felons or otherwise prohibited persons, that Teresa Walsh was in fact a responsible person, that Mark Walsh individually committed a willful violation when Mrs. Walsh was not disclosed on the Mountaineer application, and that Mark Walsh is "the applicant" for purposes of MEW's application under § 923(d)(1)(C), then MEW's application has been properly denied under the governing statutes. But if even one of those things is *not*

found, then MEW's application was proper and should have been granted. If it should have been granted, there is no attempt to "circumvent" the statute.

Consequently, the second analysis in *Casanova Guns* is irrelevant and surplusage in either case. If MEW's application should have been denied under the governing statutes, the second analysis in *Casanova Guns* is unnecessary to decide this case. If MEW's application should have been granted, there is no attempt to circumvent, and the second analysis in *Casanova Guns* does not apply.[9]

## CONCLUSION

For the reasons stated above, the decision of the District Court should be reversed, and the case remanded with instructions to enter summary judgment in favor of MEW, or to hold an evidentiary hearing to resolve disputed issues of material fact.

## REQUEST FOR ORAL ARGUMENT

Appellant requests oral argument on this appeal.

---

[9] In fact, MEW's application for an FFL expressly discloses the existence of Mountaineer Gun Sales, the revocation of Mountaineer's FFL, and the involvement of Mark F. Walsh and Mark A. Walsh with Mountaineer. JA 187. An attempt to comply with the law is not an attempt to circumvent it.

Respectfully submitted,

/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
Telephone: (703) 352-7276
dan@danpetersonlaw.com

September 15, 2014                    Counsel for Appellant

# CERTIFICATE OF COMPLIANCE

I hereby certify that the attached Brief of Appellant complies with Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure. According to the word count feature of the word-processing system used to prepare the brief, it contains 13,916 words, exclusive of those matters that may be omitted under Rule 32(a)(7)(B)(iii).

I further certify that the attached brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6). It was prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

/s/ Dan M. Peterson
Dan M. Peterson

Counsel for Appellant

Date: September 15, 2014

# <u>ADDENDUM</u>

## TABLE OF CONTENTS

**Addendum Page**

18 U.S.C. § 921 ...................................................................................................2

18 U.S.C. § 922(g) ..............................................................................................9

18 U.S.C. § 922(n) ............................................................................................11

18 U.S.C. § 923(a) ............................................................................................11

18 U.S.C. § 923(c) ............................................................................................12

18 U.S.C. § 923(d)(1).......................................................................................12

18 U.S.C. § 923(d)(2).......................................................................................14

18 U.S.C. § 923(f)(2) ........................................................................................14

18 U.S.C. § 923(f)(3) ........................................................................................14

18 U.S.C. § 926.................................................................................................14

28 U.S.C. § 1291 ..............................................................................................15

28 U.S.C. § 1331 ..............................................................................................16

27 C.F.R. § 478.47(b) .......................................................................................16

West Virginia Code § 31B-2-201 .....................................................................16

West Virginia Code § 31B-2-202(a)..................................................................17

West Virginia Code § 31B-4-404 .....................................................................17

Addendum 1

**18 U.S.C. § 921 Definitions**

(a) As used in this chapter—

(1) The term "person" and the term "whoever" include any individual, corporation, company, association, firm, partnership, society, or joint stock company.

(2) The term "interstate or foreign commerce" includes commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, but such term does not include commerce between places within the same State but through any place outside of that State. The term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

(4) The term "destructive device" means—
(A) any explosive, incendiary, or poison gas—
(i) bomb,
(ii) grenade,
(iii) rocket having a propellant charge of more than four ounces,
(iv) missile having an explosive or incendiary charge of more than one-quarter ounce,
(v) mine, or
(vi) device similar to any of the devices described in the preceding clauses;

(B) any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and
(C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from

Addendum 2

which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10; or any other device which the Attorney General finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational or cultural purposes.

(5) The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(6) The term "short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such a weapon as modified has an overall length of less than twenty-six inches.

(7) The term "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

(8) The term "short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches.

(9) The term "importer" means any person engaged in the business of importing or bringing firearms or ammunition into the United States for purposes of sale or distribution; and the term "licensed importer" means any such person licensed under the provisions of this chapter.

(10) The term "manufacturer" means any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution; and the

term "licensed manufacturer" means any such person licensed under the provisions of this chapter.

(11) The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

(12) The term "pawnbroker" means any person whose business or occupation includes the taking or receiving, by way of pledge or pawn, of any firearm as security for the payment or repayment of money.

(13) The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

(14) The term "indictment" includes an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted.

(15) The term "fugitive from justice" means any person who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding.

(16) The term "antique firearm" means—
(A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; or
(B) any replica of any firearm described in subparagraph (A) if such replica—
(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or
(ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or

(C) any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which

Addendum 4

cannot use fixed ammunition. For purposes of this subparagraph, the term "antique firearm" shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.

(17)(A) The term "ammunition" means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm.
(B) The term "armor piercing ammunition" means—
(i) a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or
(ii) a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

(C) The term "armor piercing ammunition" does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.

(18) The term "Attorney General" means the Attorney General of the United States

(19) The term "published ordinance" means a published law of any political subdivision of a State which the Attorney General determines to be relevant to the enforcement of this chapter and which is contained on a list compiled by the Attorney General, which list shall be published in the Federal Register, revised annually, and furnished to each licensee under this chapter.

(20) The term "crime punishable by imprisonment for a term exceeding one year" does not include—
(A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

(B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

(21) The term "engaged in the business" means—
(A) as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;
(B) as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;
(C) as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;
(D) as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;
(E) as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and
(F) as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the

ammunition imported.

(22) The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

(A) is committed by an individual who is not a national or permanent resident alien of the United States;

(B) involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

(C) is intended—

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by assassination or kidnapping.

(23) The term "machinegun" has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).

(24) The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

(25) The term "school zone" means—

(A) in, or on the grounds of, a public, parochial or private school; or

(B) within a distance of 1,000 feet from the grounds of a public, parochial or private school.

(26) The term "school" means a school which provides elementary or secondary education, as determined under State law.

(27) The term "motor vehicle" has the meaning given such term in section 13102 of title 49, United States Code.

Addendum 7

(28) The term "semiautomatic rifle" means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge.

(29) The term "handgun" means—
(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and
(B) any combination of parts from which a firearm described in subparagraph (A) can be assembled.

[(30), (31) Repealed. Pub. L. 103–322, title XI, §110105(2), Sept. 13, 1994, 108 Stat. 2000.]

(32) The term "intimate partner" means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person.

(33)(A) Except as provided in subparagraph (C), the term "misdemeanor crime of domestic violence" means an offense that—
(i) is a misdemeanor under Federal, State, or Tribal law; and
(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

(B)(i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless—
(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and
(II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either
(aa) the case was tried by a jury, or
(bb) the person knowingly and intelligently waived the right to have the case tried

Addendum 8

by a jury, by guilty plea or otherwise.

(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

(34) The term "secure gun storage or safety device" means—
(A) a device that, when installed on a firearm, is designed to prevent the firearm from being operated without first deactivating the device;
(B) a device incorporated into the design of the firearm that is designed to prevent the operation of the firearm by anyone not having access to the device; or
(C) a safe, gun safe, gun case, lock box, or other device that is designed to be or can be used to store a firearm and that is designed to be unlocked only by means of a key, a combination, or other similar means.

(35) The term "body armor" means any product sold or offered for sale, in interstate or foreign commerce, as personal protective body covering intended to protect against gunfire, regardless of whether the product is to be worn alone or is sold as a complement to another product or garment.
(b) For the purposes of this chapter, a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located.

## 18 U.S.C. §922(g)

(g) It shall be unlawful for any person—

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

(2) who is a fugitive from justice;

(3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

(4) who has been adjudicated as a mental defective or who has been committed to a

mental institution;

(5) who, being an alien—

(A) is illegally or unlawfully in the United States; or

(B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

(6) who has been discharged from the Armed Forces under dishonorable conditions;
(7) who, having been a citizen of the United States, has renounced his citizenship;

(8) who is subject to a court order that—

(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

(9) who has been convicted in any court of a misdemeanor crime of domestic violence,

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Addendum 10

**18 U.S.C. § 922(n)**

(n) It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**18 U.S.C. § 923(a)**

(a) No person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General. The application shall be in such form and contain only that information necessary to determine eligibility for licensing as the Attorney General shall by regulation prescribe and shall include a photograph and fingerprints of the applicant. Each applicant shall pay a fee for obtaining such a license, a separate fee being required for each place in which the applicant is to do business, as follows:
(1) If the applicant is a manufacturer—
(A) of destructive devices, ammunition for destructive devices or armor piercing ammunition, a fee of $1,000 per year;
(B) of firearms other than destructive devices, a fee of $50 per year; or
(C) of ammunition for firearms, other than ammunition for destructive devices or armor piercing ammunition, a fee of $10 per year.

(2) If the applicant is an importer—
(A) of destructive devices, ammunition for destructive devices or armor piercing ammunition, a fee of $1,000 per year; or
(B) of firearms other than destructive devices or ammunition for firearms other than destructive devices, or ammunition other than armor piercing ammunition, a fee of $50 per year.

(3) If the applicant is a dealer—
(A) in destructive devices or ammunition for destructive devices, a fee of $1,000 per year; or
(B) who is not a dealer in destructive devices, a fee of $200 for 3 years, except that the fee for renewal of a valid license shall be $90 for 3 years.

**18 U.S.C. § 923(c)**

(c) Upon the filing of a proper application and payment of the prescribed fee, the Attorney General shall issue to a qualified applicant the appropriate license which, subject to the provisions of this chapter and other applicable provisions of law, shall entitle the licensee to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license. Nothing in this chapter shall be construed to prohibit a licensed manufacturer, importer, or dealer from maintaining and disposing of a personal collection of firearms, subject only to such restrictions as apply in this chapter to dispositions by a person other than a licensed manufacturer, importer, or dealer. If any firearm is so disposed of by a licensee within one year after its transfer from his business inventory into such licensee's personal collection or if such disposition or any other acquisition is made for the purpose of willfully evading the restrictions placed upon licensees by this chapter, then such firearm shall be deemed part of such licensee's business inventory, except that any licensed manufacturer, importer, or dealer who has maintained a firearm as part of a personal collection for one year and who sells or otherwise disposes of such firearm shall record the description of the firearm in a bound volume, containing the name and place of residence and date of birth of the transferee if the transferee is an individual, or the identity and principal and local places of business of the transferee if the transferee is a corporation or other business entity: *Provided*, That no other recordkeeping shall be required.

**18 U.S.C. § 923(d)(1)**

(d)(1) Any application submitted under subsection (a) or (b) of this section shall be approved if—

(A) the applicant is twenty-one years of age or over;

(B) the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate or foreign commerce under section 922(g) and (n) of this chapter;

(C) the applicant has not willfully violated any of the provisions of this chapter or regulations issued thereunder;

(D) the applicant has not willfully failed to disclose any material information required, or has not made any false statement as to any material fact, in connection with his application;

(E) the applicant has in a State (i) premises from which he conducts business subject to license under this chapter or from which he intends to conduct such business within a reasonable period of time, or (ii) in the case of a collector, premises from which he conducts his collecting subject to license under this chapter or from which he intends to conduct such collecting within a reasonable period of time;

(F) the applicant certifies that—

(i) the business to be conducted under the license is not prohibited by State or local law in the place where the licensed premise is located;

(ii)(I) within 30 days after the application is approved the business will comply with the requirements of State and local law applicable to the conduct of the business; and

(II) the business will not be conducted under the license until the requirements of State and local law applicable to the business have been met; and
(iii) that the applicant has sent or delivered a form to be prescribed by the Attorney General, to the chief law enforcement officer of the locality in which the premises are located, which indicates that the applicant intends to apply for a Federal firearms license; and

(G) in the case of an application to be licensed as a dealer, the applicant certifies that secure gun storage or safety devices will be available at any place in which firearms are sold under the license to persons who are not licensees (subject to the exception that in any case in which a secure gun storage or safety device is temporarily unavailable because of theft, casualty loss, consumer sales, backorders from a manufacturer, or any other similar reason beyond the control of the licensee, the dealer shall not be considered to be in violation of the requirement under this subparagraph to make available such a device).

Addendum 13

**18 U.S.C. § 923(d)(2)**

(2) The Attorney General must approve or deny an application for a license within the 60-day period beginning on the date it is received. If the Attorney General fails to act within such period, the applicant may file an action under section 1361 of title 28 to compel the Attorney General to act. If the Attorney General approves an applicant's application, such applicant shall be issued a license upon the payment of the prescribed fee.

**18 U.S.C. § 923(f)(2)**

(2) If the Attorney General denies an application for, or revokes, a license, he shall, upon request by the aggrieved party, promptly hold a hearing to review his denial or revocation. In the case of a revocation of a license, the Attorney General shall upon the request of the holder of the license stay the effective date of the revocation. A hearing held under this paragraph shall be held at a location convenient to the aggrieved party.

**18 U.S.C. § 923(f)(3)**

(3) If after a hearing held under paragraph (2) the Attorney General decides not to reverse his decision to deny an application or revoke a license, the Attorney General shall give notice of his decision to the aggrieved party. The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held under paragraph (2). If the court decides that the Attorney General was not authorized to deny the application or to revoke the license, the court shall order the Attorney General to take such action as may be necessary to comply with the judgment of the court.

**18 U.S.C. §926 Rules and regulations.**

(a) The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter, including—

(1) regulations providing that a person licensed under this chapter, when dealing

Addendum 14

with another person so licensed, shall provide such other licensed person a certified copy of this license;

(2) regulations providing for the issuance, at a reasonable cost, to a person licensed under this chapter, of certified copies of his license for use as provided under regulations issued under paragraph (1) of this subsection; and

(3) regulations providing for effective receipt and secure storage of firearms relinquished by or seized from persons described in subsection (d)(8) or (g)(8) of section 922.

No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the Secretary's [1] authority to inquire into the disposition of any firearm in the course of a criminal investigation.

(b) The Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations.

(c) The Attorney General shall not prescribe rules or regulations that require purchasers of black powder under the exemption provided in section 845(a)(5) of this title to complete affidavits or forms attesting to that exemption.

## 28 U.S.C. §1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C. §1331. Federal question**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**27 C.F.R. § 478.47(b)**

(b) The Chief, Federal Firearms Licensing Center, shall approve a properly executed application for license on ATF Form 7, ATF Form 7CR, or ATF Form 8 Part II, if:

(1) The applicant is 21 years of age or over;

(2) The applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited under the provisions of the Act from shipping or transporting in interstate or foreign commerce, or possessing in or affecting commerce, any firearm or ammunition, or from receiving any firearm or ammunition which has been shipped or transported in interstate or foreign commerce;

(3) The applicant has not willfully violated any of the provisions of the Act or this part;

(4) The applicant has not willfully failed to disclose any material information required, or has not made any false statement as to any material fact, in connection with his application; and

(5) The applicant has in a State (i) premises from which he conducts business subject to license under the Act or from which he intends to conduct such business within a reasonable period of time, or (ii) in the case of a collector, premises from which he conducts his collecting subject to license under the Act or from which he intends to conduct such collecting within a reasonable period of time.

**W. Va. Code § 31B-2-201**

A limited liability company is a legal entity distinct from its members.

Addendum 16

**W. Va. Code § 31B-2-202(a)**

(a) One or more persons may organize a limited liability company, consisting of one or more members, by delivering articles of organization to the office of the secretary of state for filing, together with the fee prescribed by section two, article one, chapter fifty-nine of this code.

**W. Va. Code § 31B-4-404. Management of limited liability company.**

(a) In a member-managed company:

(1) Each member has equal rights in the management and conduct of the company's business; and

(2) Except as otherwise provided in subsection (c) of this section or in section 8-801(b)(3)(i), any matter relating to the business of the company may be decided by a majority of the members.
(b) In a manager-managed company:

(1) Each manager has equal rights in the management and conduct of the company's business;

(2) Except as otherwise provided in subsection (c) of this section or in section 8-801(b)(3)(i), any matter relating to the business of the company may be exclusively decided by the manager or, if there is more than one manager, by a majority of the managers; and

(3) A manager:

(i) Must be designated, appointed, elected, removed or replaced by a vote, approval or consent of a majority of the members; and

(ii) Holds office until a successor has been elected and qualified, unless the manager sooner resigns or is removed.

(c) The only matters of a member or manager-managed company's business requiring the consent of all of the members are:

Addendum 17

(1) The amendment of the operating agreement under section 1-103;

(2) The authorization or ratification of acts or transactions under section 1-103(b)(2)(ii) which would otherwise violate the duty of loyalty;

(3) An amendment to the articles of organization under section 2-204;

(4) The compromise of an obligation to make a contribution under section 4-402(b);

(5) The compromise, as among members, of an obligation of a member to make a contribution or return money or other property paid or distributed in violation of this chapter;

(6) The making of interim distributions under section 4-405(a), including the redemption of an interest;

(7) The admission of a new member;
(8) The use of the company's property to redeem an interest subject to a charging order;

(9) The consent to dissolve the company under section 8-801(b)(2);

(10) A waiver of the right to have the company's business wound up and the company terminated under section 8-802(b);

(11) The consent of members to merge with another entity under section 9-904(c)(1); and

(12) The sale, lease, exchange or other disposal of all, or substantially all, of the company's property with or without goodwill.

(d) Action requiring the consent of members or managers under this chapter may be taken or without a meeting.

(e) A member or manager may appoint a proxy to vote or otherwise act for the member or manager by signing an appointment instrument, either personally or by the member's or manager's attorney-in-fact.

Addendum 18

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2014, electronic PDFs of the foregoing Brief of Appellant and of the Joint Appendix were uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

/s/ Dan M. Peterson
Dan M. Peterson